UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA :
:
v. : Case No. 2:00-cr-119
:
STEPHEN AGUIAR :

## OPINION AND ORDER

Defendant Stephen Aguiar, proceeding *pro se*, previously filed a petition for writ of error coram nobis challenging his 2001 conviction for possession of heroin with intent to distribute. The Court denied the petition, concluding that it was untimely and that Aguiar had failed to show prejudice resulting from his attorney's allegedly-ineffective assistance. Aguiar now moves to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that the Court should reconsider its ruling. The government opposes the motion. For the reasons set forth below, the Court's prior ruling is affirmed and the Rule 59(e) motion is **denied**.

## Factual Background

The facts underling Aguiar's petition were set forth in the Court's prior Opinion and Order (ECF No. 48), and are largely repeated here. These facts are not disputed.

Aguiar alleges in his petition that he was arrested in Burlington, Vermont on November 6, 2000. In the course of the arrest, law enforcement seized 20.1 grams of heroin and 84.6 grams of powder cocaine. Aguiar admitted in a post-arrest

statement that the drugs belonged to him.

On December 7, 2000, a federal grand jury returned a two-count indictment charging Aguiar with possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and possession with intent to distribute a quantity of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Defense counsel allegedly advised Aguiar that he faced a potential sentence of ten years to life on Count One.

The defense subsequently filed a motion to suppress Aguiar's post-arrest statement. Prior to the suppression hearing, the prosecution communicated to defense counsel that if the hearing went forward, the government would ultimately argue for an obstruction of justice enhancement and oppose any acceptance of responsibility reduction. After relaying this message to his client, defense counsel presented Aguiar with a plea agreement.

The agreement proposed that Aguiar would plead guilty to a single count and be sentenced under Section 841(b)(1)(C) for less than 100 grams of heroin. There would be no statutory minimum, but according to counsel the Court could impose a sentence of up to 30 years in prison and supervised release of no less than six years to life. Aguiar would stipulate to a base offense level of 26 based upon drug quantity, including relevant conduct of 200 grams of heroin and 840 grams of cocaine. Counsel reportedly

advised Aguiar that, given the possibility of a life sentence if the case went to trial, he should accept the plea agreement.

Aguiar did offer to plead guilty, but claims that he "vehemenly contested" the drug amount alleged in the plea agreement, and informed the Court at the Rule 11 hearing that the plea deal felt coerced and involuntary.  The transcript from the Rule 11 hearing reveals that when the Court asked Aguiar whether anyone had threatened him or forced him in any way to plead guilty, Aguiar responded: "No, sir."  ECF No. 43 at 7.  Aguiar did inform the Court that he was entering a guilty plea in order to avoid a charge of obstruction of justice and remain eligible for acceptance of responsibility.  The Court made clear that those issues would be decided in a "separate determination," and that acceptance of responsibility was not necessarily determined by whether Aguiar had "objected to the introduction of evidence or not."  *Id.* at 12.

Aguiar further explained to the Court that he had weighed the risks and benefits of a plea, that there was "no question [as] to [his] guilt," but that he believed the police were being untruthful about his post-arrest statement and "that there are guidelines that people have to go by."  *Id.* at 14-15.  The Court took a short recess so that Aguiar could again discuss the agreement with his attorney.

When the hearing resumed, defense counsel reiterated that

3

Aguiar remained disturbed about potential police dishonesty. Counsel also conceded that even if the post-arrest statement was suppressed, arguments for suppression of other drug evidence constituted a "long shot" and that Aguiar was aware of this fact. *Id.* at 18. When Aguiar asked about how the Court makes credibility determinations, both defense counsel and the Court explained that a totality of circumstances test would be applied. When Aguiar suggested that he take a polygraph test, the Court discussed the admissibility of such a test. The Court then took a second brief recess.

After the second recess, Aguiar informed the Court of his belief that "it's within my best interests to accept the plea agreement." *Id.* at 43. The government provided a proffer of facts to which Aguiar agreed, and the Court accepted the plea. With regard to the government's threat to oppose acceptance of responsibility if the suppression hearing went forward, the Court noted that in any plea agreement "[b]oth sides give up something and both sides get something in return. So I don't think that there really is any question about voluntariness here." *Id.* at 43. Aguiar was subsequently sentenced to 92 months in prison to be followed by a six-year term of supervised release.

Aguiar claimed in his coram nobis petition that throughout the criminal proceeding, his attorney and the Court assumed that he would be subject to a sentence enhancement under Section 851,

4

when in fact there could be no such enhancement because the government failed to file a Section 851 information. Aguiar further argued that without the required Section 851 information, he was subject to a maximum sentence of 40 years under Section 841(b)(1)(B), and not the life sentence of which his attorney warned. Aguiar also claimed that his supervised release would have been capped at three years, and not the six to which he was sentenced. This misinformation from counsel allegedly played a substantial role in Aguiar's decision to plead guilty.

In 2009, having served fewer than three years of his supervised release on the 2001 sentence, Aguiar was arrested and charged with conspiracy. Because of his arrest, his supervised release was revoked. In 2011, he was convicted of conspiracy and sentenced to 30 years in prison to be followed by 10 years of supervised release. He was also convicted of violating his previous supervised release, and given a concurrent sentence of 36 months. Aguiar claims that his most recent sentence was enhanced by the 2001 conviction under 28 U.S.C. § 851, as well as United States Sentencing Guideline § 4B1.1. He contends that without these enhancements, his minimum statutory sentence would have been 10 years, and not the 30 years to which he was sentenced.

Aguiar reports that his 2001 sentence, including supervised release, expired on August 4, 2014. He filed his petition for

writ of coram nobis on September 29, 2014. The government concedes that it never filed a Section 851 information in the 2001 case, but contends that the indictment alleging a previous felony conviction was the "functional equivalent." The government also notes that it could have filed a Section 851 information any time prior to trial.

## Discussion

### I. Timeliness of the Rule 59(e) Motion

Aguiar submits his motion under Rule 59(e), styled as a motion to alter or amend judgment. The Second Circuit has held that a district court may grant such a motion "to correct a clear error of law or prevent manifest injustice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks and citation omitted). Rule 59(e) "covers a broad range of motions," and "the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008).

A motion under Rule 59(e) "must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(e). The government contends that Aguiar's motion is untimely, as the Court's Opinion and Order issued on April 29, 2015 and Aguiar's

6

motion was docketed 33 days later, on June 1, 2015. However, because Aguiar is incarcerated, the so-called "prison mailbox rule" requires the Court to consider the date on which Aguiar presented his motion to prison staff for mailing. *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Nobel v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001). Although it is not clear from the docket when prison staff received the motion, courts in this Circuit typically assume that the inmate gave the filing to officials on the date on which it was signed. *See Johnson v. Coombe*, 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) ("the Court assumes that the prisoner gave his petition to prison officials for mailing on the date he signed it"); *Torres v. Irvin*, 33 F. Supp. 2d 257, 270 (S.D.N.Y. 1998) (collecting cases). Here, the motion was signed on May 26, 2015, which was within the 28-day filing period allowed by Rule 59(e). The Court will therefore consider the motion as timely filed.

**II. Reconsideration of the Petition's Timeliness**

The Court previously found that Aguiar's coram nobis petition was untimely. According to Aguiar, he first learned about the Section 851 information requirement during a status conference in 2011, held in the context of his more-recent conspiracy conviction. He also discovered in 2011 that a coram nobis petition was possible. In August 2012, he reviewed the 2001 case docket and discovered that no Section 851 information

7

was filed.  He did not file his coram nobis petition until 2014, and the Court concluded that this delay was too long.  Aguiar now asks the Court to reconsider that conclusion.

No statute of limitations governs the filing of a coram nobis petition.  *See Foont v. United States*, 93 F.3d 76, 79 (2d Cir. 1996).  Still, the petitioner must demonstrate "sound reasons" for any delay in seeking relief.  *Id.*  "The critical inquiry . . . is whether the petitioner is able to show justifiable reasons for the delay."  *Id.* at 80.  "A district court considering the timeliness of a petition for a writ of error coram nobis must decide the issue in light of the circumstances of the individual case."  *Id.* at 79.

Aguiar contends that the Court improperly used 2011 as the baseline for determining timeliness, and should instead have used 2012, since he did not discover the absence of a Section 851 information filing until he received the 2001 case docket sheet.  Aguiar also claims that the Court's prior ruling applied a simple, "per se" rule that a delay of two or three years is unacceptable, and failed to give due consideration the individual circumstances of his case.  He submits that those circumstances included: his placement in segregation for seven months, with no access to his legal papers, shortly after he received a copy of the docket sheet in September 2012; his nine-month effort to obtain relevant documents, including his indictment and plea

8

agreement; and his mental impairments, which allegedly interfere with his ability to focus.

Far from applying a "per se" rule, the Court previously considered many of the same factors cited by Aguiar in his current motion:

> Aguiar blames the delay in part upon the fact that he has been represented by the same attorney since 2001. At the same time, he concedes that he was able to discover the lack of a Section 851 information when he received a copy of the docket sheet in 2012. He further claims that the delay was due to a traumatic brain injury, and cites a neuropsychological evaluation from 2010 indicating "cognitive and emotional sequelae of both untreated Attention Deficit Disorder and traumatic brain injury." ECF No. 37-9 at 19.
>
> In his reply memorandum, Aguiar details his efforts to perform legal research and obtain corroborating evidence after his receipt of the docket sheet in 2012. Those efforts were impeded, in part, by time that Aguiar spent in administrative segregation, presumably for some form of misconduct. Aguiar also explains that, in the face of other Court filings suggesting that a Section 851 information *had* been filed in the 2001 case, he did not want to rely solely upon the lack of a docket entry. Ultimately, however, he did just that, filing his petition in 2014 and obtaining confirmation of his "hunch" when the government filed its response. Of course, an earlier and more timely filing would have achieved the same result.

*United States v. Aguiar*, No. 2:00-CR-119, 2015 WL 1954214, at *5 (D. Vt. Apr. 29, 2015).

It is true that circumstances such as administrative segregation without access to legal materials may support the tolling of a limitations period. *Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (stating in dicta that a court

9

would be "obliged to consider granting a request for equitable tolling in order to avoid the constitutional difficulty posed by such a denial of access to the federal courts" during prison segregation). Here, however, Aguiar's time in segregation was just one of several delays. The longest delay was the initial one, as his first inquiry into the Section 815 information question came ten years after his sentencing. Although he claims that he did not become aware of the Section 815 issue until 2011, he has not shown sound reasons why he was unable to uncover the alleged error until it became a factor in a subsequent sentencing.

Even if the Court assumes, as it did previously, that the 2011 discovery date was reasonable, his next delay was in obtaining the docket sheet. Court docket sheets are readily available, and the record indicates that Aguiar's sister has made efforts on his behalf to obtain relevant documentation. *See* ECF No. 35 (seeking an order requiring the court reporter to respond to Aguiar's sister's telephone calls). It is thus unclear why it took until September 2012 to obtain the docket sheet.

If, as Aguiar now argues, September 2012 is the proper date from which the Court should assess any delay, it still took nearly two years to file his coram nobis petition. While segregation for several months may well have impeded Aguiar's ability to pursue his cause, he ultimately filed his petition

over one year after his reported release, with only the docket sheet suggesting that no Section 851 information had been filed. As the Court noted previously, that filing could have been accomplished sooner.

The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted). Here, Aguiar has not raised any issues or data that the Court overlooked. In fact, the Court considered the circumstances raised in his petition and reply, including his mental health issues, relative to the question of timeliness. The Court has now reviewed those circumstances a second time, and again concludes that Aguiar has not provided sound reasons for filing his petition thirteen years after his sentencing.

### III. Reconsideration of the *Strickland* Analysis

Aguiar also contends that the Court mis-applied the prejudice prong of the *Strickland* standard for ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984) (petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). Aguiar's initial claim was that counsel erroneously informed him of a potential life

11

sentence (as opposed to a maximum of 40 years), and it was this advice that caused him to "reluctantly agree[]" to the plea offer. Aguiar also claims that his six-year term of supervised release was twice that allowed without a Section 851 information filing, and that counsel's failure to object caused additional prejudice.

The crux of Aguiar's claim is the assertion that he would not have entered a guilty plea if properly advised by his defense attorney. "[W]here a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty." *Missouri v. Frye*, 566 U.S. 133, 148 (2012). "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and the strong societal interest in finality has "special force with respect to convictions based on guilty pleas." *United States v. Timmreck*, 441 U.S. 780, 784 (1979). Accordingly, the Supreme Court recently urged that "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). When applying *Strickland*, and unlike the

12

performance analysis under the first prong, the determination of prejudice "may be made with the benefit of hindsight." *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)); *see also Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007).

Here, the Court previously determined that Aguiar had failed to meet his burden of showing a reasonable probability that he would have gone to trial. While Aguiar criticizes portions of the Court's analysis, several factors fully support the Court's conclusion. For example, the government notes that it could have filed a Section 851 notice at any time prior to trial, thereby eradicating any prejudice brought about by counsel's allegedly-faulty advice. The record also indicates that the government would likely have argued for an obstruction enhancement, and against a downward departure for acceptance of responsibility, which was ultimately awarded to Aguiar as a result of his plea.

Indeed, Aguiar received substantial benefit from the plea agreement. At the plea hearing, defense counsel admitted that a pending motion to suppress certain drug evidence was a "long shot," and given the government's additional evidence of controlled drug buys, an "even a longer shot." ECF No. 43 at 19. Aguiar's plea deal relieved him of a mandatory minimum sentence. Furthermore, the government agreed to argue for a sentence at the low end of the applicable guidelines. When the plea agreement

13

offered an offense level of 26, defense counsel stated his "surprise" that Mr. Aguiar "was that low because . . . they're attributing about 250 grams of heroin to him and 800 grams of cocaine. Those numbers could go much higher depending on how certain statements are interpreted." *Id.* at 33. In other words, the evidence at trial could have supported a far greater drug quantity, and Mr. Aguiar was aware of that possibility when he entered his plea. Finally, while the indictment listed Mr. Aguiar's prior felony offense and that offense was discussed during the plea colloquy, the plea agreement erased any chance of an enhanced term of imprisonment consistent with Section 851. The Court's prior determination with regard to prejudice is therefore affirmed.

## Conclusion

For the reasons set forth above, Aguiar's motion to alter or amend judgment is **denied**.

DATED at Burlington, in the District of Vermont, this 2nd day of August, 2017.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge